UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
**UNITED STATES OF AMERICA**,                                :
                                                             :
                – against –               :   **MEMORANDUM DECISION AND ORDER**
                                                             :
**MARTIAL H. AMILCAR**,                                      :  23-CR-18 (AMD)
                                                             :
                 Defendant.                            :
------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

Before the Court is the defendant's motion to suppress statements he made to law enforcement agents, identification testimony, and evidence from the defendant's Facebook and Instagram accounts, obtained pursuant to a search warrant. (ECF No. 32-1.)[1] In the alternative, the defendant requests a hearing on his motion to suppress statements and identification evidence. As explained below, the motion is denied.

## BACKGROUND

### I. The Charged Offense

On February 22, 2019, fifteen-year-old Samuel Joseph was shot to death as he was leaving his apartment building. (ECF No. 33 at 9.) The defendant was originally charged with using a firearm during and in relation to the murder in-aid-of racketeering of Samuel Joseph. (ECF No. 1 ¶ 8.) He has since been charged, along with others, with racketeering and murder in-aid-of racketeering. (ECF No. 36.)

---

[1] The motion includes an unsworn declaration pursuant to 28 U.S.C. § 1746 that is "based on records on file in [their] office, discussions with the defendant and other witnesses, independent investigation, and discovery provided by the government." (ECF No. 32-1 at 1, ¶ 3.) "Factual statements" in the declaration "are made on information and belief, based on [those] sources." (*Id.* ¶ 3.)

## II.     Statements to Law Enforcement

The defendant seeks to suppress custodial statements he made to law enforcement agents on August 14, 2019, September 11, 2020, and November 24, 2021.  (ECF No. 32-1 at 6–7.)  The government responds that it does not intend to use the August 2019 and November 2021 statements; with respect to the September 2020 statements, the government asserts that defendant waived his Sixth Amendment rights after agents advised him of his constitutional rights, and spoke with the agents voluntarily.  (ECF No. 33 at 16–17.)

On about August 14, 2019, an NYPD detective interviewed the defendant at Rikers Island — where he was detained on a parole violation for a previous state court conviction — about the murder of Samuel Joseph.  (ECF No. 32-1 at 2; ECF No. 33 at 10.)  The defendant refused to speak to the detective.  (ECF No. 32-1 at 2; ECF No. 33 at 10–11.)

On September 11, 2020, the defendant was charged by complaint in the Eastern District of New York with possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g).  *See United States v. Martial H. Amilcar*, No. 20-CR-378 (E.D.N.Y.).  At that point, the defendant was being held at Riker's Island on a state gun charge arising out of the conduct charged in the federal complaint.[2]  (ECF No. 32-1 at 3.)  Federal law enforcement agents arrested him at Rikers Island and brought him to 26 Federal Plaza, where federal agents interviewed him before his arraignment.  (ECF No. 35 at 3.)  According to the government, an agent advised the defendant of his constitutional rights "[a]t the start of the interview" and the defendant "waived his rights and voluntarily spoke with law enforcement."  (ECF No. 33 at 11; ECF No. 33-1 at 3.)  During the interview that followed, the defendant "admitted his membership in the Hyena Crips

---

[2] The defendant was represented by counsel on the state law charge, which was later dismissed because of the federal charge.  (ECF No. 32-1 at 3; ECF No. 33 at 11.)

2

gang." (ECF No. 33 at 12 (citing ECF No. 33-1, Sept. 11, 2020 Report of Investigation).) The defendant maintains that he "did not knowingly, voluntarily, and intelligently waive his Sixth Amendment right to counsel." (ECF No. 32-1 at 3.) The defendant ultimately pled guilty to the felon-in-possession charge. *See Amilcar*, No. 20-CR-378. On November 5, 2021, Judge Kiyo A. Matsumoto sentenced him to twenty three months in prison and three years of supervised release. (ECF No. 33 at 12.)

On November 24, 2021, federal law enforcement agents interviewed the defendant at the MDC. (ECF No. 32-1 at 3; ECF No. 33 at 12.) The government maintains that the agents "instructed [the defendant] not to make any statements, and then showed him a still image of surveillance video from the day of the Samuel Joseph murder;" the defendant "stated, 'that's not me.'" (ECF No. 33 at 12.) The defendant asserts that the agents "questioned him and made other statements designed to elicit incriminating responses, including advising him of the status of his brother's case and showing [him] stills from surveillance video," but did not advise the defendant of his rights "at any point." (ECF No. 32-1 at 3–4.)[3] The defendant "made several statements before informing the agents that he wanted to return to his cell." (*Id.* at 4.)

## III. Out-of-Court Identifications

The government interviewed three witnesses who identified the defendant from "surveillance or other video" (ECF No. 32-1 at 4) "at or around the time" Samuel Joseph was murdered (ECF No. 33 at 12).

On November 4, 2022, federal agents and prosecutors interviewed Witness 1, a "close relative" "who has known [the defendant] since birth." (*Id.*; *see also* ECF No. 32-1 at 4.)

---

[3] At the time, the defendant's brother, Martial C. Amilcar, had been charged in the Kings County Supreme Court with murdering Samuel Joseph. (ECF No. 33 at 10.)

3

Witness 1 "reviewed several surveillance video clips" from "shortly before and after" the murder; Witness 1 "could not see the face of the person" shown in two clips (ECF No. 33 at 12–13), but identified the defendant in a third, three-second-long clip (*id.*; ECF No. 32-1 at 4).

Witness 2 "is an acquaintance of [the defendant] who has known him for more than 10 years." (ECF No. 33 at 13.)[4] In a March 10, 2022 interview with law enforcement, Witness 2 "recognized [the defendant] in surveillance videos disseminated by the media" after the murder. (*Id.*) On February 2, 2023, Witness 2 watched the same video clip that was shown to Witness 1, and also identified the defendant. (*Id.*; *see also* ECF No. 32-1 at 4.)

Witness 3, "a friend" (ECF No. 32-1 at 4) who "previously dated" the defendant (ECF No. 33 at 13), initially refused to answer questions about the defendant, but was "compelled to testify" before the grand jury by an order of immunity (*id.*). In the grand jury, Witness 3 identified the defendant as the person in the surveillance video clip from which Witness 1 and Witness 2 identified him. (*Id.*)[5]

## IV. Search Warrant

On December 28, 2020, Magistrate Judge Cheryl Pollak signed a warrant[6] authorizing the government to search 16 social media accounts, including the defendant's Facebook account

---

[4] The government asserts that Witness 2 "met [the defendant] 'approximately four times'" (ECF No. 35 at 6 n.2).

[5] The government showed the witness "a portion of a televised news program" in which "the announcer states that [the defendant] is 'a person [police] are looking for in a fatal shooting of a 15-year-old boy in Brooklyn.'" (ECF No. 32-1 at 4.) The news clip "included both surveillance video of an unknown person and a still photo (apparently taken from social media) depicting either [the defendant] or his brother." (*Id.*) The defendant contends that "it is impossible to say" from the transcript of Witness 3's testimony "if [she] identified [the defendant] from the still image or the surveillance video" (*id.*), but the government maintains that "Witness 3 explicitly states in the grand jury proceedings . . . that the witness is identifying the defendant from the surveillance video." (ECF No. 33 at 7 n.3).

[6] On January 7, 2021, Judge Pollak signed an amended affidavit that corrected a typographical error in the identification of Subject Account-17. (*See* ECF No. 33-4.)

4

("Subject Account-11") and Instagram account ("Subject Account-17"),[7] for "evidence, fruits, and instrumentalities" of violations of certain federal law offenses. (ECF No. 33-2.)[8] In a supporting affidavit, James Grzelak, a Task Force Officer ("TFO") with the NYPD and Homeland Security Investigations' Violent Gang Task Force, described the Hyena Crips and its violent criminal activity. (*Id.* at 26–27.) TFO Grzelak also explained that police recovered a cell phone in connection with a carjacking; the cell phone "contained a June 6, 2020 Facebook audio call in which multiple people discussed the rules and structure of the Hyena Crips and the criminal activities of the gang." (ECF No. 33 at 14–15 (citing ECF No. 33-2 at 30–34).) TFO Grzelak cited the following facts as probable cause for searching the Facebook and Instagram accounts. As for the Facebook account, the defendant participated in the June 6, 2020 Facebook call, during which another participant "remind[ed] [him] that they 'smoked'" (injured) someone. (*Id.* at 15.) In addition, the defendant's Facebook account included photographs of the defendant with "multiple firearms." (*Id.*) The defendant used emojis "that are regularly used by members and associates of the Hyena Crips," and commenters to the defendant's account addressed him as "Hyenssss." (ECF No. 33-2 at 53–55.) The defendant's Instagram account used the same emojis, included a photograph of the defendant making a "gesture used by other known Hyena members," and used the hashtag "#hyenalifestyle." (*Id.* at 61, 63.)

The warrant directed Facebook and Instagram to disclose information, including, for example, "[a]ll contact and personal information," "activity logs," posts, photos and videos

---

[7] Subject Account-17 and the other subject Instagram accounts are "stored at premises owned, maintained, controlled, and operated by Facebook Inc." (ECF No. 33-2 at 12.)

[8] The subject offenses included 18 U.S.C. §§ 1962 (racketeering and racketeering conspiracy), 1951 (Hobbs Act robbery), 2119 (carjacking), 922(g) (felon in possession of a firearm), 924(c) (illegal possession of firearms during and in relation to crimes of violence), 1343 and 1349 (wire fraud conspiracy), as well as 21 U.S.C. § 841 (possession with intent to distribute controlled substances). (ECF No. 33-2 at 7–8, 15.)

uploaded by the account user, photos and videos in which the user is tagged, "profile information," "stored communications," location information, IP logs, content that the user has "liked," friends lists, searches, use of Facebook Marketplace, and privacy settings. (*Id.* at 6–7, 14–15.)[9] There were time specifications for both accounts — from May 17, 2017 through January 7, 2021 for Subject Account-11 and from June 29, 2020 through January 7, 2021 for Subject Account-17. (*Id.* at 4–7, 12–15.) The warrant also permitted law enforcement agents to

---

[9] For Subject Account-11, the warrant directed Facebook to disclose:

(a) All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail address, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers; (b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities; (c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them; (d) All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected 'Friend' requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications; (e) All stored communications, including public messages, private messages, group messages, direct shares, stories, chat history, video calls, audio calls, made or received by the user, chat history, video calling history, and pending 'Friend' requests; (f) All 'check ins' and other location information; (g) All IP logs, including all records of the IP addresses that logged into the account; (h) All records of the Account's usage of the 'Like' feature, including all Facebook posts and all non-Facebook webpages and content that the user has 'liked'; (i) All information about the Facebook pages that the account is or was a 'fan' of; (j) All past and present lists of friends created by the account; (k) All records of Facebook searches performed by the account; (l) All information about the user's access and use of Facebook Marketplace; (m) The types of service utilized by the user; (n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number); (o) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and (p) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

The warrant directed Facebook to disclose identical information from Subject Account-17.

seize information related only to the subject offenses involving the 16 named individuals. (*Id.* at 6–8, 15–16.)

## LEGAL STANDARD

### I.     Fourth Amendment

The Fourth Amendment provides that "a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King*, 563 U.S. 452, 459 (2011). To determine whether probable cause exists to support a search warrant, "[t]he issuing judicial officer must 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). A warrant is sufficiently "particular" if it (1) "identif[ies] the specific offense for which the police have established probable cause," (2) "describe[s] the place to be searched," and (3) "specif[ies] the items to be seized by their relation to designated crimes." *United States v. Galpin*, 720 F.3d 436, 445–46 (2d Cir. 2013). "[A]n otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based." *Id.* at 446.

"Despite their frequent conflation, '[over]breadth and particularity are related but distinct concepts." *United States v. Shipp*, 392 F. Supp. 3d 300, 307 (E.D.N.Y. 2019) (quoting *United States v. Ulbricht*, 858 F.3d 71, 102 (2d Cir. 2017), *cert. denied*, 585 U.S. 1033 (2018)). "A warrant may be broad, in that it authorizes the government to search an identified location or object for a wide range of potentially relevant material, without violating the particularity

7

requirement." *Id.* (quoting *Ulbricht*, 858 F.3d at 102). Similarly, "[w]hen the criminal activity pervades [an] entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements." *Ulbricht*, 858 F.3d at 102. "In determining whether a warrant is overbroad, courts must focus on 'whether there exists probable cause to support the breadth of the search that was authorized.'" *Shipp*, 329 F. Supp. 3d at 307 (quoting *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 464 (S.D.N.Y. 2013)).

A search or seizure pursuant to a warrant is ordinarily presumed valid. *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003). "A magistrate's determination of probable cause" — whether probable cause existed to issue the warrant in the first place and whether the scope of the warrant comported with probable cause — "should be paid great deference." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (citation and quotation marks omitted); *see also United States v. Dupree*, 781 F. Supp. 2d 115, 154 (E.D.N.Y. 2011). That is because the magistrate is in the best position to determine whether the underlying affidavit adequately "detailed" the investigation and appropriately "credit[ed] the source of the information." *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

Even if a court determines that a warrant is flawed, suppression is not always appropriate. The good faith exception applies "when the agents executing a search warrant 'act with an objectively reasonable good-faith belief that their conduct is lawful.'" *United States v. Jones*, 43 F.4th 94, 111 (2d Cir. 2022) (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)); *see also United States v. Leon*, 468 U.S. 897, 921–22 (1984) ("[W]hen an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope, . . . there is [generally] no police illegality and thus nothing to deter."). The good faith exception does not apply where (1) the court "was misled by information in an affidavit that the

8

affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) "where the issuing magistrate wholly abandoned his judicial role;" (3) a warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) a warrant is so "facially deficient" that officers "cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923.

## II. Fifth Amendment

The Fifth Amendment protects a person's right not to incriminate himself. U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself."). Criminal defendants are entitled to prophylactic warnings advising them of their constitutional rights to protect them "from the 'inherently compelling pressures' of custodial interrogation." *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) (citing *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). "[I]f the individual indicates 'that he wishes to remain silent, the interrogation must cease.'" *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) (quoting *United States v. Medunjanin*, 752 F.3d 576, 585 (2d Cir. 2014)). The individual "must assert his right affirmatively and unambiguously." *Id.* (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010)).

An "accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived his . . . rights when making the statement." *Id.* (quoting *Berghuis*, 560 U.S. at 382). The waiver "'must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and must be 'knowing[]' in the sense that it was 'made *with a full awareness of both the nature of the right being abandoned* and the consequences of the decision to abandon it.'" *Id.* (quoting *Berghuis*, 560 U.S. at 382–83 (emphasis in original)).

9

The prosecution must prove waiver "by a preponderance of the evidence," and it may be inferred "from all the circumstances." *Berghuis*, 560 U.S. at 384.

The Fifth Amendment's Due Process Clause also protects "the right not to be the object of suggestive police identification procedures that create a very substantial likelihood of irreparable misidentification." *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992). "'[T]he linchpin in determining the admissibility of identification testimony' is reliability." *United States v. Diaz*, 986 F.3d 202, 207 (2d Cir. 2021) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). "If the procedures used to obtain an identification are unduly suggestive, 'due process requires that the identification testimony be excluded unless a threshold level of reliability can be established through evidence that is independent of the suggestive procedure." *Id.* (citation omitted).

The first inquiry is "whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). "[I]dentification procedures are unduly suggestive when they involve coercive elements employed to elicit a specific identification." *United States v. Al-Farekh*, 956 F.3d 99, 111 (2d Cir. 2020). However, "[e]ven if an identification is improperly suggestive, 'the witness's identification of the suspect . . . is still admissible if the identification has independent reliability.'" *Diaz*, 986 F.3d at 207 (quoting *United States v. Eltayib*, 88 F.3d 157, 167 (2d Cir. 1996)). Courts evaluate the "totality of the circumstances" to determine whether identification evidence is admissible: "(1) the witness's opportunity to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at confrontation, and (5) the

10

length of time between the crime and the confrontation." *United States v. Reed*, 570 F. App'x 104, 109 (2d Cir. 2014) (quoting *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972)).

### III. Sixth Amendment

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel attaches only once "adversarial proceedings" have been "commenced against an individual, 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *United States v. Vasquez*, 675 F.2d 16, 17 (2d Cir. 1982) (quoting *Brewer v. Williams*, 430 U.S. 387, 398 (1977)). The right is "offense specific," which means that it "cannot be invoked for all future prosecutions." *United States v. Ying Lin*, No. 15-CR-601, 2018 U.S. Dist. LEXIS 115764, at *20 (E.D.N.Y. July 11, 2018) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). Rather, the right to counsel attaches only to conduct that is the "same offense" as the charged conduct; it does not attach to uncharged crimes that are "factually related" to or "inextricably intertwined with" the charged offense. *Id.* (quoting *Texas v. Cobb*, 532 U.S. 162, 172 (2001)); *see also United States v. Moore*, 670 F.3d 222, 236 (2d Cir. 2012) (holding that a defendant did not have a Sixth Amendment right to counsel because "the Sixth Amendment is offense specific"). Like the Fifth Amendment right against self-incrimination, a defendant may waive his right to counsel, as long as the waiver is "voluntary, knowing, and intelligent." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009).

## DISCUSSION

### I. Statements to Law Enforcement

The government asserts that it "does not anticipate seeking to introduce [the August 2019 or the November 2024 statements] in its case-in-chief at trial," but "reserves the right to use

11

these statements if the defendant opens the door by testifying falsely or inconsistently at trial . . . ." (ECF No. 33 at 16.) Accordingly, the defendant's motion to suppress the August 14, 2019 and November 21, 2024 statements is denied as moot. *See United States v. Robinson*, No. 16-CR-545, 2017 U.S. Dist. LEXIS 182889, at *7–8 (E.D.N.Y. Nov. 1, 2017) ("The Government states that it 'does not intend to introduce [the defendant's] statements . . . in its case-in-chief' . . . [a]ccordingly, the [d]efendant's motion to suppress the . . . statements is denied as moot."); *United States v. Mouzon*, No. 16-CR-284, 2016 U.S. Dist. LEXIS 177819, at *1 n.1 (S.D.N.Y. Dec. 2, 2016) (same).

The defendant moves to suppress his September 11, 2020 statement, claiming that agents took it in violation of his right to counsel. Specifically, the defendant argues that his right to counsel attached at his August 26, 2020 arraignment in Kings County Criminal Court, when he was appointed counsel for the state gun case; the defendant reasons that he was "entitled to have his counsel present" for any subsequent interviews with law enforcement, including with federal agents. (ECF No. 32-1 at 6 (citing *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009)).) The defendant acknowledges that the right to counsel "is not absolute," but says that the government has not demonstrated that he "voluntarily, knowingly, and intelligently waived his right to counsel." (*Id.* at 7.)[10] The government responds that the defendant's representation in the state proceeding "did not extend to the federal proceeding, and the right to counsel had not yet attached in the federal case" on September 11, 2020. (ECF No. 33 at 17.) In any event, the government says, the defendant "properly waived that right when he agreed to speak to federal law enforcement agents" after they informed him of his constitutional rights. (*Id.*)

---

[10] The defendant does not argue that the September 11, 2020 statement should be suppressed on Fifth Amendment grounds. (*See* ECF No. 32-1 at 6–7.)

12

The defendant is not entitled to a hearing on his motion because he has not established a factual dispute about whether he waived his right to counsel. "An evidentiary hearing is normally required in motions to suppress where a factual issue," such as whether the defendant properly waived his right to counsel, "is in dispute." *United States v. Lopez*, No. 05-CR-655, 2006 U.S. Dist. LEXIS 28631, at *7 (E.D.N.Y. Mar. 31, 2006) (quoting *United States v. Cortez*, No. 05-CR-55, 2005 U.S. Dist. LEXIS 26174, at *5 (S.D.N.Y. Oct. 27, 2005)). The defendant must show that a disputed factual issue exists by "submit[ting] sworn factual allegations from an individual with personal knowledge." *United States v. Townsend*, No. 15-CR-653, 2016 U.S. Dist. LEXIS 82174, at *4 (E.D.N.Y. 2016) (collecting cases); *see also, e.g.*, *Lopez*, 2006 U.S. Dist. LEXIS 28631, at *8 ("[T]o create a factual dispute, defendant must submit sworn factual allegations from an affiant with personal knowledge." (quoting *United States v. Fruchter*, 104 F. Supp. 2d 289, 308 (S.D.N.Y. 2000))). "Courts have made clear that attorney affidavits are insufficient to warrant a hearing." *United States v. Shaw*, 260 F. Supp. 2d 567, 570 (E.D.N.Y. 2003) (collecting cases); *see also United States v. Gillette*, 383 F.2d 843, 848–49 (2d Cir. 1967) (attorney's statement did not raise factual issue absent allegation of personal knowledge).

In this case, the defendant did not submit an affidavit based on personal knowledge addressing whether he waived his waived his right to counsel, assuming that the right to counsel had attached based on the proceedings in Brooklyn Criminal Court. Accordingly, defense counsel's declaration is insufficient to create a factual dispute about whether there was a waiver, and the motion must be denied. *See, e.g.*, *United States v. Bell*, No. 23-CR-212, 2024 U.S. Dist. LEXIS 40888, at *13–14 (S.D.N.Y. Mar. 8, 2024) (denying the defendant's request for an evidentiary hearing and motion to suppress statements where he had not "submitted a sworn

affidavit establishing a question of fact as to whether he knowingly, intelligently, and voluntarily waived his *Miranda* rights, and instead relie[d] solely on unsworn arguments by his attorney").[11]

## II.  Out-of-Court Identifications

The defendant also moves to suppress the witnesses' identifications, claiming that procedures were unreliable, suggestive and coercive.  The defendant argues that the agents and prosecutors "believed that the witness[es] . . . [were] lying when they could not identify [the defendant] in the video shown to them," the witnesses knew that the defendant's brother was arrested and indicted for the same murder and that the agents or prosecutors "believed that [the defendant] had committed the murder," and that the surveillance videos were equivalent to the "'widely condemned' use of show-up identifications."  (ECF No. 32-1 at 8–9 (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)).

The identifications at issue in this case are not like the classic eyewitness identification scenario, in which a witness identifies a stranger; rather, they are "confirmatory identification[s]" by witnesses who know the defendant independently.  *United States v. Stephenson*, No. 20-CR-511, 2021 U.S. Dist. LEXIS 206467, at *11 (E.D.N.Y. Oct. 26, 2021); *see United States v. Wade*, 388 U.S. 218, 235–37 (1967) (discussing "the dangers inherent in eyewitness identification and the suggestibility inherent in the context of the pretrial identification").

There is no material factual dispute about the identification procedures employed here.  As explained above, the defense did not submit an affidavit based on personal knowledge that there was anything unduly suggestive about the circumstances under which the witnesses identified the defendant.  Moreover, it is clear from the parties' submissions that the

---

[11] Because there is no factual dispute as to whether the defendant's waiver was voluntary, the Court does not address whether the defendant's right to counsel for the felon-in-possession charge attached when he was arraigned on the state gun charges.

14

identifications — by one of the defendant's relatives, an acquaintance of over 10 years, and a friend and former romantic partner — were "independently reliable." *Stephenson*, 2021 U.S. Dist. LEXIS 206467, at *11; *see also, e.g.*, *Kelly v. Lee*, No. 11-CV-3903, 2014 U.S. Dist. LEXIS 132972, at *27–28 (E.D.N.Y. Sept. 22, 2014) (finding pretrial identification "independently reliable" where identification was made by someone previously familiar with the defendant); *United States v. Estupinian-Jamarillo*, No. 08-CR-320, 2009 U.S. Dist. LEXIS 88107, at *5 (S.D.N.Y. 2009) (finding pretrial out-of-court identification was independently reliable because the witness had known the defendant since childhood (citing *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990))); *United States v. Crumble*, No. 18-CR-32, 2018 U.S. Dist. LEXIS 61581, at *4–5 (E.D.N.Y. 2018) (same, where the witness had known the defendant for eight years). The motion to suppress as well as the request for an evidentiary hearing on the out-of-court identifications are therefore denied. *United States v. Sosa*, No. 17-CR-580, 2018 U.S. Dist. LEXIS 158170, at *8 (S.D.N.Y. Sept. 12, 2018) ("[T]here is no *per se* rule requiring a *Wade* hearing to determine the admissibility of identification evidence, and where the government makes a sufficient showing that the identification is independently reliable, motions for pre-trial *Wade* hearings should be denied." (citing *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir. 1984))).

### III. Search Warrant

Judge Pollak signed search warrants authorizing the government to search Subject Account-11 and Subject Account-17 — the defendant's Facebook and Instagram accounts — for "evidence, fruits, and instrumentalities" of violations of certain federal law offenses. (ECF No. 33-2.) The warrant time limited disclosure of information on Subject Account-11 from May 17,

15

2017 through January 7, 2021 and Subject Account-17 from June 29, 2020 through January 7, 2021. (*Id.* at 4–7, 12–15.)

The defendant argues that the Facebook and Instagram evidence must be suppressed. The defendant claims that the warrant was overbroad; according to the defendant, the supporting affidavit established probable cause for only a "narrow category of evidence," but that the warrant improperly authorized the disclosure of "all evidence" Facebook had "for both accounts." (ECF No. 32-1 at 9–10.) The defendant says that the affidavit "provided information that evidence of certain offenses would be found in [Facebook] audio calls[,] Facebook posts," and Instagram "profile pages and posts," but the warrant directed Facebook to disclose data from 16 broad categories of information. (*Id.* at 5; *see* ECF No. 33-2 at 6–7, 13–15.) The government responds that the warrant was sufficiently particularized, limited by specific, relevant date ranges, and tailored to the subject offenses. (ECF No. 33 at 33–38; *see* ECF No. 33-2 at 8–9, 16.)

"A general search of electronic data is an especially potent threat to privacy because hard drives and e-mail accounts may be 'akin to a residence in terms of the scope and quantity of private information [they] may contain.'" *United States v. Shipp*, 392 F. Supp. 3d 300, 307 (E.D.N.Y. 2019) (quoting *Galpin*, 720 F.3d at 445); *see also Galpin*, 720 F.3d at 447 (explaining that "[t]his threat demands a heightened sensitivity to the particularity requirement in the context of digital searches"). "This threat is further elevated in a search of Facebook data because, perhaps more than any other location — including a residence, a computer hard drive, or a car — Facebook provides a single window through which almost every detail of a person's life is visible." *Shipp*, 392 F. Supp. 3d at 308; *cf. Riley v. California*, 573 U.S. 373, 394 (2014) ("The

16

sum of an individual's private life can be reconstructed [through the contents of a cell phone] through a thousand photographs labeled with dates, locations, and descriptions.").

Courts in this Circuit have upheld social media warrants like the warrant at issue here, "recogniz[ing] the inherent difficulty with 'digital media searches.'" *United States v. Qing Ming Yu*, No. 22-CR-208, 2023 U.S. Dist. LEXIS 126229, at *54–55 (July 20, 2023) (upholding a search warrant that required Instagram to "provide broad categories of information from August 1, 2018 to the date of the warrant" and "permitt[ed] the government to seize a narrower set of information tailored to the crimes specified"); *see also, e.g., id.* at *55 (collecting cases). Although the warrant application established probable cause to believe that relevant evidence could be found in particular features of the of the Subject Accounts, "[i]t is well-established that a search warrant can properly permit the [g]overnment to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the government." *United States v. Liburd*, No. 17-CR-296, 2018 U.S. Dist. LEXIS 94440, at *8 (E.D.N.Y. June 5, 2018) (citation omitted). Indeed, courts have upheld broader social media warrants than the one at issue here, which has time and date parameters. *See Qing Ming*, 2023 U.S. Dist. LEXIS 126229, at *56; *cf. United States v. Westley*, No. 17-CR-171, 2018 U.S. Dist. LEXIS 118571, at *48–49 (D. Conn. July 17, 2018) (noting that it may be "difficult to craft date restrictions for certain [social media] content for which the affidavits plainly establish probable cause").

The defendant cites *Shipp* and out-of-circuit opinions (ECF No. 32-1 at 11–13) for the proposition that "Facebook warrants of the kind at issue here unnecessarily 'authorize precisely the type of exploratory rummaging the Fourth Amendment protects against.'" *Shipp*, 392 F. Supp. 3d at 311 (quoting *United States v. Bradbury*, No. 14-CR-71, 2015 U.S. Dist. LEXIS

17

76849, at *9 (N.D. Ind. June 15, 2015)). In *Shipp*, the court observed that "the format of the Facebook [warrant] — an enumerated list of sixteen different categories of information associated with the account — suggests the organized nature of data associated with a Facebook account," and "provides support for [the] contention that the search authorized by the [warrant] could have been more clearly defined . . . and limited to the categories of information associated with the Facebook account in which there was probable cause to believe that such evidence might be found." *Id.*; *see also, e.g.*, *United States v. Hamilton*, No. 18-CR-57, 2019 U.S. Dist. LEXIS 159077, at *14 (E.D. Ky. Aug. 30, 2019) ("[T]here was no suggestion" in the affidavit supporting the search warrant that the defendant "bought or sold drugs through Facebook Marketplace," or that evidence could be found in a search of the defendant's "'gifts,' 'pokes,' all Facebook searches performed, all groups [the defendant] is in, his rejected 'friend' requests, his 'friends' list user identification numbers, [or] his 'check ins;'" thus, "law enforcement was unlikely to find evidence of that crime in reviewing [those features].") As explained above, however, the warrant in this case was sufficiently particularized and limited to relevant time periods.

The government argues that in any event the good faith exception applies, which is what most of the courts in the cases that the defendant cites, including *Shipp* and *Hamilton*, ultimately decided. (ECF No. 33 at 38–41; *see also* ECF No. 32-1 at 12.) In this case, the defendant does not allege that TFO Grzelak lied in the affidavit or misled Judge Pollak into issuing the warrant. And while the defendant asserts that the government cannot rely on the good faith exception in light of the precedent that the defendant cites (ECF No. 35 at 9), "the constitutionality of a broad social media search warrant remains a developing area of the law, and the Second Circuit has not yet decided this issue," *Qing Ming Yu*, 2023 U.S. Dist. LEXIS 126229, at *57–58; *see also*

18

*Westley*, 2018 U.S. Dist. LEXIS 118571, at *51 ("[T]he application of search warrants to Facebook accounts is a relatively new area of the law."); *United States v. Blake*, 868 F.3d 960, 975 (11th Cir. 2017) (describing the issue as "not an open and shut matter" and a "close enough question" such that the officers could reasonably rely on the warrants); *Shipp*, 392 F. Supp. 3d at 312 ("The [warrant affidavit] articulated probable cause to search at least certain categories of information or services associated with the Facebook account, and as the [g]overnment notes, other district courts have declined to suppress evidence obtained pursuant to facially similar warrants."). *But see United States v. Irving*, 347 F. Supp. 3d 615, 624–26 (D. Kan. 2018) (invalidating the Facebook warrant and declining to apply good faith).

For these reasons, the defendant's motion to suppress evidence recovered from the searches of Subject Accounts 11 and 17 is denied.

## CONCLUSION

For these reasons, the defendant's motion is denied.

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       February 27, 2025

19