

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TH:DEL/JKW/JBD
F. #2020R00851

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 6, 2025

<u>By ECF</u>

The Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Martial H. Amilcar
     <u>Criminal Docket No. 23-18 (S-1) (AMD)</u>

Dear Judge Donnelly:

  The government respectfully submits this letter in advance of the sentencing of defendant Martial H. Amilcar, which is scheduled for November 13, 2025, at 10:30 a.m.

  For more than a decade, the defendant terrorized his own Brooklyn neighborhood as a member of the Hyena Crips street gang. He carried guns, he shot at rival gang members, and he led violent armed robberies of local businesses. In February 2019, the defendant shot and killed 15-year-old Samuel Joseph as Joseph was leaving his apartment building in retaliation for perceived disrespect against the Hyenas and the defendant's younger brother. For years, the defendant publicly let his younger brother take the blame for the murder, while, privately, the defendant claimed credit to elevate his own status in the gang. He also continued his close association with the Hyena Crips and continued spreading violence in the community until another arrest in August 2020.

  The government submits that a sentence of 35 years' imprisonment, which is within the applicable United States Guidelines ("U.S.S.G." or "Guidelines") range, is necessary here. Such a sentence accounts for the sentencing factors under Title 18, United States Code, Section 3553(a), including the defendant's senseless killing of a child, his long promotion of a violent gang, and the protection of the public from further crimes of the defendant. In short, it is what justice requires.

I.  Background

    A.  The Hyena Crips Enterprise

Hyena Crips is a violent street gang that mainly operates out of Brooklyn, with ties to Haiti.  See Presentence Investigation Report ("PSR") ¶ 4.  Hyena Crips members gain status by "putting in work," which means by committing crimes including fraud, robberies and acts of violence, including murders.  Id.  Members of the gang also engaged in drug trafficking, bank fraud and access device fraud to earn money to be shared among members of the gang.  Id.  To promote and enhance the prestige, reputation and position of the gang with respect to rival organizations, members of the Hyena Crips used intimidation, threats of violence, and acts of violence to keep victims and rivals in fear.  Id. ¶ 7.  Between approximately 2011 and 2020, there were numerous stabbings, assaults and murders committed by members of the Hyena Crips against individuals they believed to be rival gang members, in particular, members of the Haitian Loc ("HL").

    B.  The Defendant's Membership in the Enterprise

The defendant is a long-time and committed member of the Hyena Crips.[1]  He has a prominent tattoo with the text "Hyena" on his left arm.  A photograph of the tattoo is below.



Following his commission of the murders and robberies charged here, the defendant promoted the Hyena Crips and his status in the gang on his social media accounts.  For instance, in a video posted to the defendant's Instagram account on or about July 14, 2020, several months after he was released on parole following several violations, the defendant wrote, "I'm bacc tho bitch . . . like I never left . . . I'm the big Hyena."  Several weeks later, on or about July 31, 2020, the defendant posted another video of himself to his Instagram in which he is depicted waving a semi-automatic pistol in the air.  There is text transposed on the video, specifically (i) "40 ON

---

[1]  In the defendant's sentencing memorandum, he states he was a member of the Hyena Crips since at least September 2014.  Def. Mem. at 6.

ME" with a purple devil emoji, which members of the Hyena Crips gang frequently used to signify the gang; and the numbers "823," which is a sub-division of the national Crips gang, of which the Hyena Crips are a part. Still photographs from those videos are included below.

 

C.  The Defendant's Violent Acts in Furtherance of the Enterprise

As a member of the Hyena Crips, the defendant committed numerous violent acts, including murder and gunpoint robbery, on behalf of the enterprise. Indeed, he earned "status" in the gang after he murdered Samuel Joseph, an innocent fifteen-year-old boy, in a retaliatory act against the HL gang.

1. *February 22, 2019 Murder of Samuel Joseph*

On February 22, 2019, at approximately 3:34 p.m., the defendant's brother and fellow Hyena Crips gang member Martial C. Amilcar was involved in a dispute with a member of the rival gang HL ("Rival Gang Member 1"). During this dispute, which occurred in front of a convenience store located on the 1300-block of Flatbush Avenue in Brooklyn—which is located in what is known as the "Little Haiti" section of Brooklyn—Rival Gang Member 1 stabbed Martial C. Amilcar in the leg. After being stabbed, Martial C. Amilcar was driven to a relative's apartment building in Brooklyn (the "Relative's Apartment Building"). Surveillance video captured Martial C. Amilcar entering the Relative's Apartment Building with a noticeable limp and difficulty walking.

3

A short while later, as captured on surveillance video, the defendant Martial H. Amilcar arrived at the Relative's Apartment Building and later changed his clothing, putting on black sneakers, black pants, and a black Champion sweatshirt with a Champion logo visible on its front. Surveillance video shows the defendant Martial H. Amilcar outside of the Relative's Apartment Building speaking on his cell phone. Records of those calls indicate that the defendant Martial H. Amilcar contacted various members of the Hyena Crips. About eleven minutes later, at approximately 4:20 p.m., the defendant's co-conspirator ("CC-1"), another member of the Hyena Crips, arrived at the Relative's Apartment Building and entered its lobby with the defendant Martial H. Amilcar. Their entrance into the Relative's Apartment Building is depicted below:



Approximately six minutes later, at approximately 4:26 p.m., the defendant and CC-1 left the Relative's Apartment Building together.

The defendant and CC-1 then drove in a gray Nissan Altima to the vicinity of Rival Gang Member 1's residence on the 1300-block of Flatbush Avenue. After the defendant and CC-1 arrived in the area, they paced around the block, as captured on numerous surveillance cameras and as shown below:

4



   The defendant and CC-1 later approached a Flatbush Avenue apartment building where they believed Rival Gang Member 1 lived. They waited outside until the 15-year-old Joseph was walking down an internal staircase toward the street exit. Then, as captured on video surveillance, at approximately 5:40 p.m., the defendant pulled out a gun and fired into the stairwell of the apartment building. The defendant shot Joseph at close range three times, killing Joseph before he reached the door. Joseph died as a result of gunshots wounds to the head.

   After the murder, the defendant and CC-1 fled in the gray Nissan Altima.

   2. *June 9, 2020 Attempted Robbery of a Brooklyn Pharmacy*

   On June 9, 2020, the defendant and two other members of the Hyena Crips tried to rob a pharmacy on the 3400-block of Avenue H in Brooklyn. PSR ¶ 15. They entered the pharmacy and ordered the customers, employees and a small child to the back of the store. Id. The defendant placed his hands around a woman's throat, brandished a firearm and ordered her to the back of the store. Id. He then jumped over the cashier's counter towards the back office and shortly thereafter jumped back over the counter. Id. When a store employee confronted one of the defendant's co-conspirators, the co-conspirator threw a chair at the employee. The defendant and the two others then fled the pharmacy. Id. Video surveillance from inside the pharmacy captured the incident and is attached hereto as Exhibits A and B.[2] A still photograph of the defendant from the video surveillance is copied below.

---

  [2] To protect the victims' privacy and the identity of a minor child, the government respectfully requests permission to file Exhibits A and B under seal.



The following day, in a conversation on Facebook, the defendant ("Drippy Woo") referenced a video of the robbery and sent several laughing/crying emojis. PSR ¶ 15. An individual sent the defendant a message that "U was clapped yesterday," in reference to the unsuccessful robbery and the defendant indicated laughter. A copy of the conversation is included below:

> Author Ka Trazy (Facebook: 100048925673541)
> Sent 2020-06-10 00:15:27 UTC
> Body U was clapped yesterday
>
> Author Drippy Woo (Facebook: 100025713098445)
> Sent 2020-06-10 00:31:12 UTC
> Body 🤣🤣🤣
>
> Author Drippy Woo (Facebook: 100025713098445)
> Sent 2020-06-10 00:31:22 UTC
> Body I didn't even see this whole video
>
> Author Ka Trazy (Facebook: 100048925673541)
> Sent 2020-06-10 00:35:04 UTC
> Body 😂😂😂🤣🤣🤣

3. *June 19, 2020 Attempted Robbery of a Queens Caribbean Airmail Store*

On June 19, 2020—just 10 days after the defendant tried and failed to rob the pharmacy—the defendant attempted to rob a Caribbean Airmail store, a financial service company that facilitates money transfers to the Caribbean, in Queens with at least three other members of the Hyena Crips. The defendant supplied the firearm that one of his fellow gang members brandished to carry out the robbery. This time, the defendant acted as one of the getaway drivers.

6

II.  Procedural History

On January 13, 2023, the defendant was arrested and remanded into custody pending trial and has since remained incarcerated at the Metropolitan Detention Center ("MDC"). PSR ¶ 13. During his pretrial detention, the defendant has earned seven disciplinary sanctions while at the MDC: (1) fighting with another inmate (January 21, 2023); (2) possessing a hazardous tool, stealing and being in an unauthorized area (May 13, 2023); (3) two incidents of disruptive conduct (December 18, 2023); (4) possessing a hazardous tool (January 27, 2025); (5) being insolent to a staff member (February 12, 2025); (6) being insolent to a staff member (May 28, 2025); and (7) possessing drugs and/or alcohol (June 24, 2025).

On March 20, 2025, the defendant pled guilty pursuant to a plea agreement to racketeering, in violation of 18 U.S.C. § 1962(c), based on his role in the Hyena Crips street gang, and admitted to the February 2019 murder of Samuel Joseph and his participation in the June 2020 gunpoint attempted robbery of a Brooklyn pharmacy.

III.  The Defendant's Criminal History

The defendant has a lengthy criminal history, which, he claims in his sentencing submission, is part of his long association with the Hyena Crips. Three of his prior convictions involve the possession or use of firearms (as do his three charged racketeering acts in the instant case).

On September 1, 2014, the defendant, who was then 17 years old, fired one gunshot at three different individuals and in the direction of police officers. PSR ¶ 53. The defendant fled, and he was chased by police officers for four blocks until he was apprehended and police recovered a loaded firearm with a defaced serial number. Id. While those charges were pending, the defendant was arrested again. On May 11, 2015, the defendant and another man approached a victim who was waiting for the bus. They displayed a gun and demanded the victim's phone and chain. The victim tried to flee, but the defendant and other man caught him, kicked him, and removed his chain and phone.

On June 27, 2016, the defendant pled guilty to attempted criminal possession of a weapon in the second degree in satisfaction of the 2014 charge, and to attempted robbery in the first degree under youthful offender status, in satisfaction of the 2015 charge. He was sentenced to two years' incarceration and two years' post-release supervision. PSR ¶ 53. While incarcerated, the defendant incurred 15 disciplinary infractions, including violent conduct, fighting, disobeying direct orders, gang association, and creating a disturbance. Id. He was released to parole in April 2018, and was rearrested in October 2018. Id. He was placed in absconder status through November 2019, and his parole was revoked in December 2019. Id. He served a three-month alternative offender program and was released again in March 2020. Id.

Approximately five months later, on August 26, 2020, police officers attempted to stop the defendant's vehicle in a traffic stop. PSR ¶ 56. After initially pulling over, the defendant sped away and led police on a ten-minute high-speed chase through Brooklyn. Id. During this chase he drove over sidewalks and down the wrong way of one-way streets. Id. He also threw a loaded gun out of the car window, which was recovered. Id. The defendant ultimately pled guilty

to being a felon-in-possession of a firearm and was sentenced by the Honorable Kiyo A. Matsumoto to 23 months' incarceration and three years' supervised release.  See 20-CR-378 (E.D.N.Y.).  While incarcerated, he incurred one disciplinary infraction for refusing to obey an order.  PSR ¶ 56.  He was released to supervision in April 2022 and between then and his arrest in January 2023, tested positive for marijuana on three administered drug screenings.  Id.

IV.   The Sentencing Guidelines

The government agrees with Probation's calculation of the Sentencing Guidelines and submits that the defendant's offense level under the Guidelines is as follows:

R.A. 3:  Murder of Samuel Joseph

| | |
|---|---:|
| Base Offense Level (U.S.S.G. §§ 2E1.1(a)(2), 2A1.1) | 43 |
| Total: | <u>43</u> |

R.A. 8: Attempted Robbery of Brooklyn Pharmacy

| | |
|---|---:|
| Base Offense Level (§§ 2E1.1(a)(2), 2B3.1(a)) | 20 |
| Plus:   Firearm Was Brandished (§2B3.1(b)(2)(C)) | +5 |
| Total: | <u>25</u> |

Multiple Racketeering Act Analysis (§ 3D1.4)

| | |
|---|---:|
| Highest Adjusted Offense Level | 43 |
| Units: | |
| Racketeering Act 3 (§ 3D1.4(a)) | 1 |
| Racketeering Act 8 (§ 3D1.4(c)) | 0 |
| Total Units | 0 |
| Levels Added (§ 3D1.4): | +0 |
| Less:   Acceptance of Responsibility (§ 2B3.1(b)(2)(C)) | -3 |
| Total: | <u>40</u> |

Based on a criminal history category of V, this yields a Guidelines range of 360 months to life imprisonment.  PSR ¶ 88.  The defendant stipulated to the above Guidelines calculation in the plea agreement.

V. <u>Applicable Law</u>

The Sentencing Guidelines are advisory, not mandatory. <u>United States v. Booker</u>, 543 U.S. 220, 258-61 (2005). However, the Supreme Court held in <u>Booker</u> that the sentencing court must consider the Guidelines in formulating an appropriate sentence. <u>Id.</u> In <u>Gall v. United States</u>, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of <u>Booker</u>:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

<u>Gall</u>, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [The district court] must make an individualized assessment based on the facts presented." <u>Id.</u> at 49-50 (citation and footnote omitted). Those statutory factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and "the need for the sentence imposed [] (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant[,]" 18 U.S.C. § 3553(a)(2).

"[I]n the ordinary case, the [Sentencing] Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." <u>Kimbrough v. United States</u>, 552 U.S. 85, 109 (2007); see also <u>United States v. Fernandez</u>, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."). Indeed, the Supreme Court has held that, on appeal, a Guidelines sentence may be presumed reasonable because "the sentencing statutes envision both the sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives." <u>Rita v. United States</u>, 551 U.S. 338, 358 (2007). "An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general." <u>Id.</u> at 350. Furthermore, Guidelines sentences promote Congress's goal in enacting the Sentencing Reform Act—"to diminish unwarranted sentencing disparity." <u>Id.</u> at 354.

The Supreme Court has recognized that "it is uncontroversial that a major departure should be supported by a more significant justification than a minor one." <u>Gall</u>, 552 U.S. at 50. If the court decides to impose a non-Guidelines sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." <u>Id.</u>

9

VI.  A Sentence of 35 Years' Imprisonment Is Warranted Here

The government respectfully submits that the Court should impose a sentence of 35 years' imprisonment. Such a sentence would reflect the defendant's high-ranking role in the Hyena Crips, a violent criminal enterprise, the serious nature of the defendant's crimes, including the tragic death of a 15-year-old child, and is sufficient to deter the defendant from committing further crimes and endangering the public.

A.  The Seriousness of the Offense

The nature and circumstances of the defendant's offenses are extraordinarily serious. See 18 U.S.C. § 3553(a)(1). The defendant shot and killed Samuel Joseph, an innocent 15-year-old bystander, in a deliberate, premeditated and ruthless manner. Without hesitation, the defendant fired into the stairwell of an apartment building and shot a child in the head. Soon thereafter, Joseph was pronounced dead. Worse, the defendant's actions were on behalf of a notorious street gang that has terrorized his own community in Brooklyn through ruthless acts of violence, fraud and other crimes. The defendant endangered and exploited members of the public for personal gain and his actions were designed to maintain and expand the power and reputation of a vicious and violent criminal organization.

B.  History and Characteristics of the Defendant

The defendant's history and characteristics also show that strict punishment is warranted. See 18 U.S.C. § 3553(a)(1). The defendant has been engaged in criminal behavior his entire adult life. He has a lengthy criminal history, which includes multiple instances of him possessing and using firearms. In 2014, at 17, the defendant fired a gun with a defaced serial number at several people and police officers. In 2015, at 18, the defendant and his brother used a gun to rob a person at a city bus stop and assaulted him when he tried to flee. Between 2016 and 2018, the defendant was incarcerated. In 2019, at 22, and while on parole, he shot and killed Samuel Joseph with a gun. In 2020, at 23, he was arrested for firearms possession following a dangerous, high-speed car chase through Brooklyn.

This prior criminal conduct is significant for two reasons: First, prior sentences of imprisonment for his criminal conduct did not deter the defendant from committing additional crimes. To the contrary, the defendant not only continued to associate with members of the Hyena Crips, but he sought to ascend through the ranks of the gang to earn more status and respect by committing more serious crimes. Second, this criminal history reveals a troubling constant. The defendant has continued to carry and use guns despite the consequences to himself and innocent people. Through his choices and actions, he has demonstrated that he poses a danger to the community. The defendant's criminal history and the predicate acts underlying the crime of conviction here demonstrate that his violent conduct is not aberrant but rather, a pattern that he has chosen to repeat.

C.  Specific Deterrence and Incapacitation

A sentence of 35 years' imprisonment is also appropriate "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant," § 3553(b)(2)(B), (C). Prior to the murder of Samuel Joseph, the defendant served prison time for

10

two criminal convictions and those terms did not deter him from committing future crimes. The defendant returned to the gang within months of his release in 2018.

The defendant's long history of parole violations further evinces a lack of respect for the law and an unwillingness to reform. The defendant shot and killed Samuel Joseph while on parole. Then, on June 9, 2020, while still on parole, the defendant committed an attempted gunpoint robbery of the New Trend Pharmacy in Brooklyn—the basis for Racketeering Act 8. On August 26, 2020, while still on parole, the defendant was arrested for possessing a loaded firearm.

Finally, while the defendant claims he has reformed, there is little evidence in the record to support that claim. While at the MDC, the defendant has incurred disciplinary infractions on at least seven occasions, including possessing drugs/alcohol, possessing a hazardous tool on two separate occasions, disruptive conduct, and fighting with another person.[3] Indeed, the defendant has been sanctioned twice since his March 2025 guilty plea while awaiting sentencing. Accordingly, the defendant has provided the Court no basis on which to conclude that he will cease committing crimes upon release.

D. General Deterrence

A sentence of 35 years' imprisonment will help send a message that violence will not be tolerated. In light of the defendant's high-profile status within the gang, others will surely be monitoring his case to determine what repercussions follow conviction for racketeering on behalf of a violent street gang. The Court should make clear that anyone who follows a similar path will face serious repercussions.

E. The Defendant's Arguments for a Lesser Sentence Are Unavailing

The defendant makes several arguments in support of a 20-year sentence.[4] They are unpersuasive given the defendant's history and the offense conduct here.

First, the defendant argues that his youth at the time of the crimes and his difficulty upbringing warrant a significant sentencing reduction. See Def. Mot. 2-4. These factors do not mitigate his heinous conduct or warrant the requested sentencing reduction.

---

[3] The defendant also had numerous infractions while in the custody of the New York State Department of Corrections and Community Supervision, see PSR ¶ 53, and at least one infraction while detained pretrial at the MDC in connection with his felon-in-possession case, see id. ¶ 56.

[4] The probation department used the 2024 Guideline Manual to calculate the defendant's sentencing range. PSR ¶ 24. At the time of sentencing, that Manual will have been replaced by the 2025 Manual, which removed most "departures and policy statements relating to specific personal characteristics." See USSG App. C, amendment 836. The U.S. Sentencing Commission explained, however, that the Court can continue to consider relevant factors pursuant to 18 U.S.C. § 3553(a). See U.S. Sentencing Commission, Amendments to the Sentencing Guidelines at 82 (April 30, 2025), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202505_RF.pdf.

11

In his submission, the defendant claims that he "envied his mother's relationship with his brother Martial Christopher Amilcar ('Martial Christopher') and tried to earn his family's love by being Martial Christopher's protector." Def. Mot. 2. He asserts that he was seeking to "demonstrate to his parents, Martial Christopher, and his gang that he was the protector" and was acting on his "instinct to defend his brother at all costs" when he mistook Samuel Joseph for his brother and shot and killed him. Id. This justification belies common sense. Martial Christopher was not in danger when the defendant decided to hunt down the person who had stabbed his brother. Hours had passed since the stabbing. A quest for retribution or revenge is not a justification. The defendant sat idly by for over two years while his brother faced state charges for murdering Samuel Joseph, all the while knowing full well that he had committed the murder himself. If the defendant had truly wanted to protect and defendant his brother and demonstrate his loyalty to him, he would have come forward years earlier and accepted responsibility. Instead, he allowed his brother to sit in jail for a crime he did not commit. The purported justification that he was "protecting" his brother also cannot explain the defendant's other extremely violent behavior. The defendant walked into the New Trend Pharmacy in broad daylight, brandished a firearm, placed his hands around the neck of an innocent bystander and pushed the bystander, another woman and a young child towards the back of the store. These are not the actions of protector but a person driven by greed and status.

Second, the defendant argues that in addition to the three-point reduction for acceptance of responsibility, the Court should give him an additional sentencing reduction for "uncommon acceptance of responsibility" because he chose to plead guilty rather than go to trial and blame someone else for his crimes. Def. Mot. 4-5. This argument is baffling. As explained, the defendant left his younger brother on Rikers Island for nine months and on court-ordered monitoring and home detention for nearly two years. Beyond the three-point reduction for his acceptance of responsibility, the Court should not reward the defendant for not attempting to undermine the justice system.

Third, the defendant argues his sentence should be discounted by 47 months to account for time served on his three prior convictions, which he claims were also "committed in furtherance of the goals of the [Hyena Crips]." Def. Mot. 5-6. While the Court has discretion to consider prior terms of imprisonment for relevant conduct, it should not exercise that discretion here. The crimes underpinning the defendant's three prior convictions were not charged as part of the pattern of racketeering in this case. These prior convictions were not used to calculate the defendant's Guidelines offense level in this case. Moreover, beyond the defendant's self-serving assertion in his sentencing memorandum, the government has no additional evidence that his previous convictions were in furtherance of the Hyena Crips (and could not have charged felon-in-possession as a predicate to a racketeering charge, see 18 USC § 1961(1)). Nor were these prior convictions used to calculate his offense level here. The very conduct that the defendant asserts warrants a reduction of his sentence should be an aggravating factor justifying a Guidelines sentence. United States v. Mirabal, No. 16 CR. 272 (VM), 2023 WL 2401377, at *6 (S.D.N.Y. Mar. 8, 2023) (rejecting defendant's argument that he should receive credit for time he served for an uncharged shooting and noting that, if anything, the fact that the defendant was involved in another shootout was an aggravating factor justifying a longer sentence). If indeed undertaken to advance the Hyenas, these prior convictions only serve to demonstrate the defendant's long-running dedication to the gang.

Fourth, the defendant argues that his requested sentence of 20 years is appropriate because it is consistent with national sentencing data as well as data from this District and the Southern District of New York. Def. Mot. 7. A closer examination of the data, however, supports the government's requested sentence.

The defendant cites to statistics published by the United States Sentencing Commission for the mean sentence length for "murder" for each criminal history category in fiscal year 2024. See U.S. Sentencing Commission, 2024 Sourcebook of Federal Sentencing Statistics (the "Sourcebook"), Table 27, Sentence Length in Each Criminal History Category by Type of Crime, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2024/Table27.pdf. This data indicates that the average sentence for murder for defendants within Criminal History IV was 284 months' imprisonment and for defendants within Criminal History V (like the defendant) was 304 months' imprisonment. See id. Despite acknowledging that these statistics do not distinguish between defendants who went to trial and defendant who pled guilty, the defendant argues his requested sentence of 240 months is appropriate because he pled guilty. See Def. Mot. 7. The defendant also ignores that the data does not distinguish between different degrees and types of murder. Appendix A to the Sourcebook specifies that, for purposes of Table 27, "*[m]urder* includes first degree murder, second degree murder, and conspiracy or solicitation to commit murder. This category includes persons sentenced under USSG §§2A1.1, 2A1.2, and 2A1.5." See Appendix A to the Sourcebook at 189. Here, the guideline for the most serious type of murder—first-degree murder—applies: U.S.S.G. § 2A1.1. Necessarily, lower sentences for less egregious types of murder drive down the average sentence in Table 27.

With respect to persons in Criminal History Category V sentenced under U.S.S.G. § 2A1.1 in 2024, nearly half (47.1%) received sentences of life imprisonment and the next largest group (19%) received sentences between 30 years and life imprisonment. See U.S. Sentencing Commission, Interactive Data Analyzer, available at https://ida.ussc.gov/analytics/saw.dll?Dashboard. The average sentence length was 369 months' imprisonment and the median sentence was 470 months' imprisonment. See id. The government's recommended sentence of 420 months' imprisonment is generally consistent with these prior sentences.

The defendant also cites to the data for 2015 through 2024 for sentences imposed pursuant to U.S.S.G. § 2A1.1 in the Eastern District of New York and the Southern District of New York, which reflects that the average sentence for defendants who fall within Criminal History Category IV and V was 260 months. Broader national statistics are more appropriately the focus under § 3553(a)(6), however. See United States v. Johnson, 505 F.3d 120, 123 (2d Cir. 2007) ("[T]he primary purpose of § 3553(a)(6) was to reduce unwarranted sentence disparities nationwide."). But even setting that aside, the defendant fails to mention that the most common sentence in EDNY and SDNY for sentences imposed pursuant to U.S.S.G. § 2A1.1 for defendants who fall within Criminal History Category IV and V was life imprisonment. See https://ida.ussc.gov/analytics/saw.dll?Dashboard (20% of sentences were for life imprisonment).

Recent sentences in this District for similar crimes support the government's position. See, e.g., United States v. Moses, No. 22-CR-232 (CBA) (defendant sentenced to life imprisonment after guilty plea to one murder and numerous counts of sex trafficking); United States v. Amaya-Ramirez, No. 20-CR-228 (LDH) (MS-13 gang member sentenced to 45 years'

13

imprisonment after brutal murder of 17-year-old victim, following Rule 11(c)(1)(C) plea for between 30 years and life); United States v. Corbett, No. 20-CR-213 (KAM) (defendant sentenced to 45 years' imprisonment after guilty plea to three shootings, one of which resulted in death); United States v. Portillo, No. 17-CR-366 (JFB) (defendant—who was 15 at time of charged crime—sentenced to 55 years' imprisonment after guilty plea to murder of four men in a single incident); cf. United States v. Clarke, No. 20-CR-239 (BMC) (gang member sentenced to 35 years' imprisonment after guilty plea to arson and racketeering, based on drug trafficking, sex trafficking, gun trafficking, money laundering, and arson that almost killed two victims); United States v. Paniagua, No. 17-CR-307 (RRM) (MS-13 gang member sentenced to 27 years' imprisonment, following guilty plea, after commission of non-fatal shooting where the victim was paralyzed); United States v. Blanco, No. 18-CR-609 (HG) (sentenced to 22 years' imprisonment after guilty plea for conspiring with another for a year to kill two people, although Blanco never participated in an attack or wielded a weapon).  There is no reason here to treat the defendant more leniently than most defendants convicted of similar crimes.  Indeed, defendants similarly situated to Martial H. Amilcar who were convicted of murder-in-aid of racketeering, in violation of 18 U.S.C. § 1959—a crime that the government could have charged here—serve mandatory life sentences.

More fundamentally, looking at statistics or other cases will always be inadequate. Every case is unique and calls for its own unique weighing of the facts and circumstances of the case to reach an appropriate sentence. Here, the facts and circumstances are unique in their depravity, and only a sentence of 35 years is sufficient.

Finally, the defendant seeks a sentencing reduction because of his experience at MDC and the general conditions of the prison.  Def. Mot. 8-12.  While the government takes seriously the legitimate concerns raised about conditions at the MDC in recent years, it is also true that courts have more recently rejected similar claims to that made by the defendant on the grounds that conditions have improved.  See United States v. Reshard, No. 24-CR-392 (JMF) (S.D.N.Y. May 14, 2025) ("staffing is up to 75 percent, the medical services staff is significantly higher and fully staffed among nurses, the incidents of violence went from 42 in December, which was a rather significant number, to only nine in April; all of which is to say it's not nearly as bad as it was a year and a half ago and it's definitely trending in the right direction"); United States v. Burgos, No. 24-CR-650 (LTS), Plea Tr. at 43:25 (S.D.N.Y. May 21, 2025) ("the conditions at the MDC detention facility have improved, including because staffing there has been increased"). Given the defendant's seven infractions while incarcerated in pretrial detention, conditions at the MDC ought not to be a basis for additional leniency here either.

14

VII.     Conclusion

        For the reasons set forth above, the government respectfully submits that a sentence of 35 years' imprisonment is appropriate, and not greater than necessary, to reflect the seriousness of the defendant's offense and is sufficient to prevent and deter future crimes by the defendant.

        Respectfully submitted,

        JOSEPH NOCELLA, JR.
        United States Attorney

By:    /s/
        Devon Lash
        Jessica K. Weigel
        Joshua Dugan
        Assistant U.S. Attorneys
        (718) 254-7000